(C. D. 2045)

GULF OIL CORPORATION ET AL. v. UNITED STATES

United States Customs Court, Second Division

(Decided November 25, 1958)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: In this cause of action, five protests, enumerated in the attached schedule, were consolidated for hearing and determination.

The subject merchandise consists of steel casing and tubing produced according to specifications of the American Petroleum Institute and identified as API grade "J–55." This symbol indicates that the steel in the casing or tubing, as the case may be, will support a tensile load of 55,000 pounds per square inch before stretching or yielding to permanent deformation. That, in other words, is what is known as its yield strength.

The collector of customs classified the steel casing as structural shapes in paragraph 312 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 312) and the tubing was classified as tubes, not specially provided for, in paragraph 328 of said act (19 U. S. C. § 1001, par. 328), and regular duty was assessed at the appropriate rates provided in those paragraphs. That action of the collector is not herein contested.

However, in addition to the duty assessed pursuant to paragraphs 312 and 328, the collector imposed a duty of 4 per centum ad valorem as provided in paragraph 305 of said act (19 U. S. C. § 1001, par. 305), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. It is this additional duty that the plaintiffs by their protests seek to recover.

Paragraph 305 in its original form, so far as pertinent here, reads as follows, certain portions thereof being stressed:

PAR. 305. *In addition to the rates of duty provided for in paragraphs* 303, 304, 307, 308, *312,* 313, 315, 316, 317, 318, 319, 322, 323, 324, 327, *and 328 of this schedule, there shall be levied, collected, and paid on all steel* or iron *in the materials and articles enumerated or described in such paragraphs:*

    (1)  A duty of 8 per centum ad valorem if such steel or iron contains more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, or more than six-tenths of 1 per centum of nickel, cobalt, or *any other metallic element used in alloying steel* or iron: *Provided,* That phosphorus *shall not be considered as alloying material* unless present in the steel or iron in excess of 5 per centum, *nor shall manganese* or silicon *be so considered unless* either is *present in the steel in excess of 1 per centum,* or unless either is present in the iron in excess of 3 per centum; and

      *      *      *      *      *      *      *

As of January 1, 1948, the trade agreement above referred to reduced the rate of duty from 8 to 4 per centum ad valorem, and the shipments in controversy are subsequent to that date.

The testimonial record, together with certain exhibits, was presented through the following six witnesses who were called by the plaintiffs:

Charles Dunlop was division engineer since 1935 of the Humble Oil Refining Co. of Houston, Tex., his duties being those of coordinator of all of the equipment used in the drilling and producing of oil and gas wells. He received his engineering education at the University of Liverpool, England, from which he graduated in 1922, majoring in marine engineering and naval architecture, and became associated with the Humble Co. in 1924. Through his experience in the selection and inspection of equipment for his company, he became intimately familiar with casing and tubing, their structures, properties, and uses.

The second witness, Francois Rouget de Gourcez of Paris, France, was associated with Comptoir, F. B. T., a sales export agent for the French, Belgian, and Saar API pipe mills, the initials API denoting the American Petroleum Institute. He identified the manufacturers of the merchandise in each of the protests, except 295425–K, all of whom hold API licenses, and stated that the J–55 casing and tubing conform to the API specifications.

The third witness, Jean Bernard of Paris, France, testified in substance that he was associated with the Societe Lorraine Escaut of Paris, France, a metallurgical company having one department in charge of iron ore mines exploration and another known as the steel department, which comprises two main mills engaged in the production and transformation of steel, and four mills which transform steel only. As "metallurgist manager" of the steel department, Bernard has charge of all problems referring to the quality of the steel to be given to the manufacturers.

This witness gave a very impressive account of his scholastic training in French state-supported schools from which he received the degree of bachelor of letters and science in 1922. In 1929, he received the Certificate "Section Metallurgie" from "Ecole Nationale Superieure de la Metallurgie et de l'Industrie des Mines de Nancy." He then became engineer in charge of the research department at "Acieries de Longwy" Mont-St-Martin's Mill and, in 1935, was promoted to chief metallurgist at that plant. He later served as assistant to the management of that company and, in 1944, was promoted to the position of chief engineer. Without a further recitation of his extensive qualifications, suffice it to say that he continued to rise in importance in the steel industry by reason of his knowledge in the field of metallurgy. As a lecturer and as a result of his scientific activities and as a member of various technical committees, his qualifications to testify concerning the chemical, physical, and functional properties of carbon steel and alloy steel were outstanding.

Adversary counsel agreed that if Jacques Guesne of France were called as a witness for plaintiffs, he would testify that he was employed for 12 years last past in the manufacture of steel used in J–55 casing and that if he were asked the same questions on direct and cross-examination as were asked of the witness Bernard, he would give the same answers. Counsel also agreed that Michel Bouchon of France, who had been engaged in the manufacture of steel and casing 7 years, would likewise testify to the process of manufacture as given by the witness Bernard. Both of these witnesses were well qualified as expert metallurgists.

The final witness for plaintiffs, Paul D. Thomas, described himself as "materials engineer" of the Asiatic Petroleum Corp. in New York, his duties being "primarily that of a consulting metallurgist to other engineers, and to the buyers in the purchase of equipment and materials for use in the oil industry abroad." After graduating in 1927 from Ohio Wesleyan University with a B. A. in chemistry, he entered the employment of the well-known firm of Jones & Laughlin Steel Corp. in its metallurgical department at Aliquippa, Pa. He was shown to have had a very broad, active, and practical experience in research and development of steel tubular products and with steel making and mill finishing operations. He had an intimate knowledge of the manufacture of steel containing manganese ranging from approximately 0.30 to 3 per centum as early as 1927. He was well acquainted with the manufacture of steel used in casing and tubing and the specifications controlling it and had observed the manufacture of steel used in casing and tubing of various grades in all European mills with one exception. He had heard the testimony

of the witness Bernard and stated that the process of manufacture followed in the United States was the same in general principle as that described by that witness.

All of these witnesses were eminently qualified to testify to evidential facts material to the issue involved. They were men with many years' experience in various phases of the steel industry, having been engaged either as sales agents for large steel mills, or as engineers, metallurgists, and production experts. They were competent, therefore, to give specific and detailed information as to the processes employed in the fabrication of the J–55 steel in controversy—its composition, chemical and physical properties, and fitness for use. Their testimony stands unchallenged. Without expanding this opinion to great lengths by giving a detailed analysis of their testimony, it is deemed sufficient to here set forth the salient facts established by the record and upon which our conclusion will be based.

The witnesses, whose talents and training taught them the technique of combining certain elements in proper proportions to produce the best results in J–55 casing and tubing, explained the method of production substantially as follows—

The first step is charging the furnace with blast furnace iron which contains, among other things, from 2 per centum to 2.5 per centum manganese. Metal scrap and limestone are then added. The charge then becomes molten by exposure to heat in the furnace. The function of manganese is to combine with oxides that are present in the bath which would otherwise constitute impurities in the finished product if they were not removed. At this point, about 0.3 per centum manganese remains in the bath.

In the next step, silicon and ferro-manganese are added, and at a regulated temperature the manganese content combines with the sulphur in the bath and passes off as slag. It is important that the sulphur be eliminated in order that the steel may have proper "rolling" qualities. Any manganese which does not combine with the oxides or the sulphur remains in the finished steel. The importance of the manganese in these operations is its affinity for the unwanted ingredients, to eliminate them and purify the steel which is being produced. The testimony is clear and unequivocal that, in the processes above described, the application of manganese does not serve as an alloying material. It is an essential element in the manufacture of any kind of steel.

The manganese remaining in the importations under consideration, varying from 0.7 per centum to 1.4 per centum, does contribute, in a degree, to the strength of the steel in somewhat the same manner as does carbon but to a lesser extent.

The record establishes a clear line of distinction between carbon steel and alloy steel which has existed before and since the passage of the Tariff Act of 1930.

We quote the following definition of carbon steel, given by the witness Dunlop—

* * * a steel containing the elements of carbon, manganese, phosphorus, sulphur, and silicon, with maximum limits established for the phosphorus, sulphur and the silicon, and with the carbon being the principal element giving strength to the steel.

Dunlop also gave the following definition of alloy steel—

* * * a steel in which the alloying elements, such as chromium, nickel, vanadium, titanium, tungsten, elements of that nature, which are definitely in the steel industry known as alloying elements, are the contributing elements to give that steel its necessary properties and strength.

Note also the definitions of carbon steel and alloy steel in exhibit 3, pages 6 and 7, a publication known as "Steel Products Manual," issued by the American Iron and Steel Institute.

Several of the witnesses were positive in their opinion that while strength is the factor of importance in all steel, nevertheless, alloy steel has special properties which result from the addition of manganese, or elements of that nature, in such quantities and under such circumstances as to constitute an alloying material, giving it a trade nomenclature distinct and different from carbon steel.

The evidence is clear that the percentage of manganese in the casings and tubings in controversy, ranging from 0.7 per centum to 1.4 per centum, imparts no special properties to the steel which is now, and has been prior to the passage of the Tariff Act of 1930, known in the trade as ordinary carbon steel.

On the other hand, when manganese is present in quantities exceeding 1.65 per centum, steel acquires a degree of hardness not common to carbon steel. Two grades of alloy steel were described by the witnesses in which manganese is the alloying element. In one, the manganese content is about 2.75 per centum; in the other, it ranges from 7 to 12 per centum. Such steel has an unusual hardness and resistance to abrasion and is used to make railroad "frog-point" switches among other things.

The J–55 tubing and casing now before us were made to rigid and standardized specifications of the American Petroleum Institute. These standards relate to the functional properties of the steel, that is, strength and tensility. They do not specify any minimum amounts of carbon or manganese. Nevertheless, it is established by the testimony that this J–55 steel is carbon steel within the accepted understanding of that term.

In the light of the foregoing considerations, we direct our attention to the statute involved.

It is fundamental that Congress in drafting tariff statutes speaks in the language of trade and commerce and with due regard to the customs and usages of the industries being affected.

A brief analysis of paragraph 305, *supra*, clearly establishes its true meaning and scope. It does not provide primary rates of duty. It enumerates 16 paragraphs of the metal schedule of the Tariff Act of 1930 and provides that steel products which are subject to the rates of duty provided in those paragraphs shall in the presence of certain contingencies be subjected to an additional rate of duty. For instance, if such steel or iron products contain more than specified percentages of vanadium, tungsten, molybdenum, chromium, nickel, cobalt, "or any other metallic element *used in alloying* steel or iron," they shall be subject to a rate of duty in addition to the initial rate.

The proviso to paragraph 305 states—

That phosphorus *shall not be considered as alloying material unless* present in the steel or iron in excess of 5 per centum, *nor shall manganese* or silicon *be so considered unless* either is present in the steel in excess of 1 per centum, or unless either is present in the iron in excess of 3 per centum; * * * [Italics supplied.]

While it is true that some of the steel casings and tubings in the five importations here under consideration contain less than 1 per centum of manganese while others contain slightly more than 1 per centum—the variations being from 0.7 to 1.4 per centum—it is obvious from the language above quoted that whereas manganese would properly be included in the phrase "or any other metallic element," it is not sufficient that the importations are composed of steel which "contains" a metallic element (manganese). The important consideration is that it shall be *"used in alloying"* the steel of which the imported casing and tubing were fabricated.

The proviso further emphasizes the fact that to bring an importation of steel products within the scope of paragraph 305 the metallic element must be "considered" as alloying material.

Slight variations in the percentage of manganese in the ultimate product have no practical or economic importance to the steel industry. This conclusion is buttressed by the fact that the unrefuted evidence of witnesses qualified to speak on the subject establishes beyond question that the manganese contained in the importations under consideration was not "used in alloying" the steel of which they were composed. As stated by the witness Bernard, the manganese was an "ingredient" in the production of the J–55 steel but it was not used to alloy the steel.

It is not disputed that manganese is a common constituent of carbon steel and that it is used, as in this case, primarily as a deoxidizer and

desulphurizer. Under different circumstances and in different amounts, it may be used expressly as an alloying element to produce what is known as alloy steel. The record is replete with evidence that carbon steel and alloy steel are distinct products and have been so regarded since before the Tariff Act of 1930. When manganese is used in alloying steel, it imparts to the product special properties which are not present in carbon steel although the latter may contain manganese as an ingredient.

The distinction between carbon steel and an alloy steel is clearly defined in the following references:

Webster's New International Dictionary, 1929, cited in defendant's brief:

CARBON STEEL. Steel deriving its qualities from carbon chiefly without the presence of other alloying elements—opposed to alloy steel.

Note also exhibit 4, S. A. E. Handbook, published by the Society of Automotive Engineers, Inc., 1929;

Exhibit 3, the Steel Products Manual (section 18), published by the American Iron and Steel Institute, 1949;

The Summary of Tariff Information, 1921 (pp. 383 and 384), "ALLOY STEELS";

The Summary of Tariff Information, 1929 (pp. 636 and 637).

A reference to "Structure and Properties of Alloys," second edition, Brick and Phillips (pp. 306–308), points out that the composition of many grades of steel has been standardized by both the American Iron and Steel Institute and the Society of Automotive Engineers. At page 307, it is indicated that the manganese content in standard grades of carbon steel ranges from a low of 0.30–0.60 per centum (AISI No. C1010) to a high of 1.35–1.65 per centum (AISI No. C1137). On page 308, the table of alloy steels shows that where manganese is the alloying element, the low range is from 1.60–1.90 per centum manganese. This authority designates these latter as manganese type steels.

See also "An Outline of Metallurgical Practice," by Carle R. Hayward (p. 631), discussion on manganese steel.

The assertion in the proviso to paragraph 305 that manganese "shall not be considered as alloying material" unless present in steel in excess of 1 per centum or in iron in excess of 3 per centum is a clear recognition by Congress that steel and iron may be, and in fact are, fabricated with the use of manganese for purposes other than as alloying material. The importations here in controversy are a striking illustration of that fact.

It is significant that in the Tariff Act of 1913 Congress provided in paragraph 110 different rates of duty on certain descriptions and shapes of steel depending upon whether they *contained* alloys "such

as nickel, cobalt, vanadium, chromium, tungsten, wolfram, molybdenum, titanium, iridium, uranium, tantalum, boron, and *similar* alloys." [Italics supplied.]

In *Mountain Copper Co.* v. *United States*, 40 Treas. Dec. 103 at 106, T. D. 38823 (1921), cited by plaintiff, the Board of General Appraisers (now the United States Customs Court) held "that manganese present in Bessemer steel in quantity as high as 12 per cent constitutes an alloy similar to the alloys mentioned in said paragraph 110."

In an earlier case, *Wheelock, Lovejoy & Co.* v. *United States*, 28 Treas. Dec. 554, T. D. 35297 (1915), also cited by plaintiff, the syllabus reads:

Sheet steel made by the open-hearth process, containing 0.55 per cent manganese and 0.20 per cent silicon, which were added in the course of manufacture, is nevertheless dutiable at 8 per cent ad valorem under the specific provision for steel made by the open-hearth process in paragraph 110 of the act of 1913. Manganese and silicon, added in quantities absolutely essential to the production of Bessemer and open-hearth steels, can not be considered alloys within the meaning of said paragraph without rendering nugatory and incapable of application the entire provision therein for such steels.

The following is quoted from the opinion of the board:

The sheet steel herein question is shown to contain about 0.55 per cent manganese and 0.20 per cent silicon, which have been added in the course of manufacture. Aside from the circumstance that such insignificant quantities are almost too negligible to be seriously considered as alloys within the meaning of said paragraph, the fact remains that they were necessarily added in the process of making said steel by the open-hearth method; and we therefore hold that such additions in no way operated to change the dutiable status of such steel.

It is not unlikely that these decisions may have influenced Congress in drafting the metal schedule of the Tariff Act of 1922 to specifically provide in paragraph 305 (which corresponds in all material respects with paragraph 305 of the Tariff Act of 1930) for additional duty upon certain steel and iron products containing certain percentages of specified alloying materials or upon "any other metallic element *used in alloying* steel" [italics supplied], and by a proviso stating that manganese and silicon shall not "be so considered [as alloying material] unless either is present in the steel in excess of 1 per centum."

Whereas the Tariff Act of 1913 applied the additional duty if the steel product *contained* a certain amount of the alloying material, the Tariff Act of 1922, and the act of 1930 with which we are here concerned, qualified the content of manganese by the factor of *use* as an alloying material.

It is fundamental that the proper interpretation of a statute derives primarily from the natural meaning expressed in its context. Applying this standard to the language of paragraph 305, it is clear that the

additional duty is not imposed upon steel products merely because they may *contain* some of the metallic elements specified therein but only if those elements are "used in alloying steel."

Had Congress intended that steel products should be subjected to an additional duty as prescribed in paragraph 305 whenever they contain manganese, for instance, in excess of 1 per centum, that purpose could have been accomplished by simple language to that effect. However, Congress specifically made *use as an alloying element* a basic consideration for the application of the duty prescribed by paragraph 305.

Since we conclude that the taxing portion of paragraph 305 is limited to alloy steel, that is, steel containing metallic elements used as alloying material, the proviso should not be so interpreted as to deprive the primary provision of the controlling factor of *use*. The limitation of 1 per centum manganese establishes what shall *not* be *considered* as an alloying element for the purposes of the assessment of additional duty, but it in no wise impinges upon the element of use contained in the basic portion of the paragraph. Note *United States* v. *Matagrin*, 1 Ct. Cust. Appls. 309, T. D. 31406.

It is our considered opinion that, through the uncontradicted testimony of highly educated, well-trained and expertly informed witnesses skilled in the science of metallurgy and with a broad and practical experience in and intimate knowledge of the composition, production, chemical and physical characteristics, and the uses of carbon steels and alloy steels, it has been established that the importations in controversy do not "contain" manganese *used as an alloying material* within the scope of paragraph 305, *supra*. On the contrary, it was used essentially as a refining material.

We hold, therefore, that the merchandise before the court is not subject to the additional duty provided in said paragraph 305. That claim of the plaintiffs is, therefore, sustained and judgment will issue directing the collector of customs to reliquidate the entries accordingly.